UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASSOCIATION OF THEATRICAL PRESS AGENTS AND MANAGERS, UNION NO. 18032, I.A.T.S.E., AFL-CIO, CLC, by GORDON FORBES, as SECRETARY-TREASURER, | Case No. 08-CV-4395 (SAS) |
| Plaintiff, | **AFFIDAVIT OF KENNETH L. SHAITELMAN** |
| -against- | |
| ASTOR SHOW PRODUCTIONS, INC. d/b/a BLUE MAN GROUP "TUBES," MARIA DI DIA, and MANUEL IGREJAS, | |
| Defendants. | |

STATE OF NEW YORK    )
                     )  SS:
COUNTY OF NEW YORK   )

KENNETH L. SHAITELMAN, being duly sworn, deposes and says as follows:

1.      I am an attorney at the law firm Akin Gump Strauss Hauer & Feld LLP, attorneys for Defendant Astor Show Productions, Inc. d/b/a Blue Man Group, and I submit this affidavit in support of Defendants' Motion to Dismiss the Complaint.

2.      A true and correct copy of a form Standard Individual Contract of Employment is attached hereto as Exhibit 1.

3.      A true and correct copy of the Minimum Basic Agreement is attached hereto as Exhibit 2.

4.      A true and correct copy of relevant excerpts from the Agreement and Declaration of Trust Establishing the I.A.T.S.E. Annuity Fund is attached hereto as Exhibit 3.

5.      A true and correct copy of relevant excerpts from the Agreement and Declaration of Trust Establishing the League-ATPAM Pension Trust Fund is attached hereto as Exhibit 4.

6.    A true and correct copy of relevant excerpts from the Agreement and

Declaration of Trust Establishing the League-ATPAM Welfare Trust Fund is attached hereto

as Exhibit 5.

7.    A true and correct copy of relevant excerpts from the I.A.T.S.E. National

Benefit Funds Contributions & Collections Handbook is attached hereto as Exhibit 6.

KENNETH L. SHAITELMAN

Sworn to before me this
10th day of June, 2008

Notary Public

MICHELE QUICK
Notary Public, State of New York
No. 01QU5079964
Qualified in Kings County
Commission Expires August 23, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of June 2008, I caused a true and correct copy of the foregoing Affidavit of Kenneth L. Shaitelman to be served by UPS Overnight Delivery on Plaintiff's attorneys at the following address:

> Jane Lauer Barker
> Michael D'Angelo
> PITTA & DREIER LLP
> 499 Park Avenue
> New York, New York 10022

Kenneth L. Shaitelman

*Exhibit 1*

Astor Show Prods.          Employee SS# 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

Employer Name & Address C/o Maria Prods.    Employee Name & Address Maria Di Dia

1560 Broadway, #1104 NYC 10036          206 Hillcrest Ave.  Leonia, NJ 07605

EMPLOYEE IS RESPONSIBLE
FOR SUBMISSION OF
CONTRACT TO UNION OFFICE

BOND MUST BE
POSTED WHEN
FILING CONTRACT
(See #6 Below)

# Standard Individual Contract of Employment

# ASSOCIATION OF THEATRICAL PRESS AGENTS and MANAGERS

A. F. L — C. I. O.                              LOCAL #18032

165 West 46th Street, New York, N.Y. 10036 / (212) 719-3866

**This Agreement** made in quadruplicate this 17th day of November 19 94

at City of New York        State of NY ..... , by and between Astor Show Productions... Inc.
                                                                                    (Employer)

as the party of the first part, hereinafter termed the EMPLOYER and Maria Di Dia

as party of the second part, hereinafter termed the EMPLOYEE.
                                                                                    (Employee)

## WITNESSETH:

1. This Agreement is based upon and hereby incorporates as minimum terms and provisions, all of the terms and provisions of the MINIMUM BASIC AGREEMENT of the Association of Theatrical Press Agents and Managers, A.F.L. - C.I.O., and the individual operators and producers engaged therein, each in their personal, business or corporate entity, as the case may be.

2. This Agreement is to be in full force and effect and is to run to the benefit of the employee herein during the term hereof on the express condition that said employee complies with Article II, Section 1(A) of the Minimum Basic Agreement.

3. The EMPLOYER engages the EMPLOYEE and the EMPLOYEE accepts employment as and for the position

of Company Manager ............................ : for the BLUE MAN GROUP "TUBES"
                                                                    (Name of Theatre or Attraction)

to serve in Astor. Place. Theatre at the agreed salary of Off-Broadway. Mgr... Minimum .... per week:
                        (Theatre)

beginning 17. November. 1994...................... and ending ... Open-ended ..................

4. The Association of Theatrical Press Agents and Managers is herewith named and accepted as agent on behalf of the EMPLOYEE in all matters affecting the EMPLOYEE in the discharge of the rights and duties of the parties hereto.

5. It is specifically agreed that any condition or amendment of the MINIMUM BASIC AGREEMENT, which, during the term of this Agreement, may affect any term or provision herein, shall supercede and control and be regarded as though the same were expressly ratified and provided for herein.

6. Two weeks bond to be posted concurrently with the filing of contract of employment for each member employed, covering salary, vacation, pension and welfare payments in the event of default in making these payments, plus $1300 bond for authorized expenses.

7. Vacation payment of eight and one-half per cent (8½%) of gross salary to be paid weekly with commencement of employment.

8. Payments covering Hospitalization Insurance as provided in Minimum Basic Agreement are to be made payable to LEAGUE-ATPAM WELFARE FUND on demand.

9. Eight percent (8%) Pension (based on Employee Salary, including Vacation Pay) payments to be made to LEAGUE-ATPAM PENSION FUND, commencing with first date of employment. In New York City pension payments are to be made out of 4½% of box-office receipts, where that formula applies to theatre and/or attraction.

10. Employer agrees to withhold 2% of Employee gross salary, including Vacation Pay, and to make such additional dues payments directly to ATPAM.

11. In the event that the Union is required to pay salaries out of bond posted, the Union at all times pays the net salaries and payments of all Federal, State and Municipal taxes is the responsibility of the employer. For payment made out of Bond, an administrative charge of $100 will be made in each case.

12. Payment of salaries on a fee basis is prohibited. Employee gets net salary, and federal, state and local taxes are the employer's responsibility.

13. All contracts to be valid must have the signature of Union Official and the Union Seal.

14. Employee on tour will be paid per diem expenses of $ ....n/a........... weekly by separate check.

15. Special Conditions:

Astor Show Prods

ASSOCIATION OF THEATRICAL PRESS      EMPLOYER:                    EMPLOYEE Maria Di Dia
AGENTS & MANAGERS, A.F.L. - C.I.O.

By: _Susan Weiss_          By: _Maria Di Dia_ M By: _Maria Di Dia_

### MANAGEMENT MUST SIGN CONTRACTS BEFORE EMPLOYEE

NOTE: No contract of employment shall be deemed terminated unless Union and Employee are notified of closing date
       according to M. B. A. requirements.   — Tear off below when needed —

## NOTICE OF CLOSING DATE:

Termination of employment for ............................................................
                                                                    (Press Agent or Manager)

will be..................... with ............................... closes ...............
        (Date)                    (Name of Attraction or House)                    (Date)

                              By ................................

*Exhibit 2*

# MINIMUM BASIC AGREEMENT

between



and

# The League of Off-Broadway Theatres and Producers, Inc.

## JULY 1, 2001 THROUGH JUNE 30, 2006



THE ASSOCIATION OF THEATRICAL PRESS AGENTS AND MANAGERS
IATSE/AFL-CIO, CLC UNION #18032
1560 Broadway
New York, NY 10036-2501
Voice 212.719.3666
Fax 212.302.1585
E-Mail info@atpam.com

## OFF BROADWAY MINIMUM BASIC AGREEMENT

1.    **PURPOSE OF AGREEMENT**

This agreement shall be for the purpose of fostering and maintaining harmonious labor relations between the League of Off-Broadway Theatres and Producers. Inc. and the Association of Theatrical Press Agents and Managers (I.A.T.S.E # 18032).

2.    **JURISDICTION OF AGREEMENT**

This agreement shall be applicable to productions presented in the borough of Manhattan in any theater outside the area bounded by Fifth Avenue and Ninth Avenue from 34th Street to 56th Street, and by Fifth Avenue and the Hudson River from 56th Street to 72nd Street. It may not be used in any theatre having seating capacity of more that 499 seats.

The terms herein contained shall be the minimum terms to which a Union member will be entitled by virtue of his or her employment by the Employer. Nothing herein contained shall prevent a member from obtaining terms more favorable to himself/herself, but no provision of this agreement shall be waived in consideration of any more favorable terms in any other regard under any other provisions of this agreement.

3.    **TERM OF AGREEMENT**

This agreement shall be considered to have commenced on July 1, 2001 and shall be in effect for five years, expiring June 30, 2006.

> First Year, July 1, 2001 – June 30, 2002
> Second Year, July 1, 2002 – June 30, 2003
> Third Year, July 1, 2003 – June 30, 2004
> Fourth Year, July 1, 2004 – June 30, 2005
> Fifth Year, July 1, 2005 – June 30, 2006

4.    **WAGES**

The minimum wage scales for Managers and Press Agents shall be determined by the following scales of seating capacities and weekly grosses of the theatres. The sliding scale commences in the eighth (8) week after the first paid public performance.

In the first, second, third, fourth and fifth year, the Press Agent's base shall rise according to the Consumer Price Index for: All Urban Consumers for N.Y., Northern NJ, Long Island, NY-NJ, for May 31st for the appropriate agreement year, compared to the CPI for May 31st of the previous year, as published by the U.S. Bureau of Labor Statistics on June 15th. The minimum increase for Press Agents in the third, fourth and fifth year shall be three percent (3%) with a cap of five percent (5%). Should the CPI, in any year of this agreement, represent seven and one-half percent (7 ½%) or above, it is agreed that the scale shall be re-negotiated.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 2

The minimum increase for Managers shall be calculated by using the CPI or five percent (5%) for the first year and three and one-half percent (3 1/2%) for the second year of the agreement, whichever shall be higher.   The CPI shall be calculated by using the Consumer Price Index for: All Urban Consumers for N.Y., Northern NJ, Long Island, NY-NJ, for May 31st of the appropriate agreement year, compared to the CPI for May 31st of the previous year, as published by the U.S. Bureau of Labor Statistics on June 15th.  In the third, fourth and fifth year the Manager's base shall rise according the CPI. The minimum increase for the Manager's in the third, fourth and fifth year shall be three percent (3%) with a cap of five percent (5%).  Should the CPI, in any year of this agreement, represent seven and one-half percent (7 ½%) or above, it is agreed that the scale shall be re-negotiated.

The sliding scale for the first year shall increase according to the wage scale attached and shall rise in subsequent years according to the annual CPI.

See the attached Appendix A and B for the wage scale.

While the Agreement is being ratified by the League of Off-Broadway Theatres and Producers and the ATPAM membership, all payments in the first year shall be deemed retro-active to July 1, 2001.

**5.    VACATION PAY**

All employees shall be paid vacation pay of an additional eight and one-half percent (8 ½) for the balance of this agreement.

**6.    PENSION AND WELFARE**

A.    The Employer shall contribute to the League-ATPAM Pension Fund such amounts as shall be due, with adjustments to be made as required commensurate with the Broadway rates, but in no event in an amount greater than that paid by members of the League of American Theatres and Producers.  The current pension rate as of July 1, 2001 is eight percent (8%) of gross salary.

B.    The Employer shall contribute to the League-ATPAM Welfare Fund the sum of $150.50 per contracted employee per week for the first year of the Agreement.  In the second year the sum shall be $158.02 per contracted employee per week.  The third year shall be $165.93 per contracted employee per week.  The fourth and fifth years of the Agreement, the contribution amount shall be reviewed.  The recommendations from the League ATPAM Welfare Fund Actuaries shall be also be reviewed.  In such a case, the review shall begin no later than ninety (90) days before the expiration date of the agreement year.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 3

If both parties have not reached an agreement on or before forty-five (45) days before the expiration date of the Agreement year, a request for a grievance hearing with (see the Attached list of name(s)) must be filed, with written notice (sent by Certified Mail/Return Receipt Requested or by hand delivery with delivery acknowledged by a receipt), to all parties. If a grievance hearing is not filed with (see the Attached list of name(s)) as outlined above, the welfare amount for the agreement year, shall represent the Actuaries recommendations.

**7.    ANNUITY**

The Employer shall contribute to an Annuity Fund, designated by the Union, a percentage of gross weekly earnings, including vacation allowances, for each employee covered by the Agreement, effective July 1, 2001. It is the intention of both parties that any and all amounts paid into the Annuity Fund, today and in future years, shall be designated amounts diverted from the wage increases in Section 4 and not an additional amount in excess of the wage increases agreed upon. For the first year of the Agreement, the amount diverted shall be two percent (2%). In the second year of the Agreement, the amount diverted shall be one percent (1%). In the third through the fifth years of the Agreement, the amount diverted shall be half a percent (0.5%) each year. The Employer shall not be responsible for any costs associated with the administration or operation of the Annuity Fund.

**8.    SICK DAYS**

Managers shall be paid for up to six (6) sick days per 52 week period. Said sick days may not accrue beyond a 52 week cycle and must be used as actual sick days. There shall be no payments for unused sick days.

The Managers shall be entitled to one day of sick leave during the rehearsal period. At the end of the rehearsal period, this day converts to a credit of one performance of sick leave if it has not been used. Managers shall accrue sick leave at the rate of one performance for each four weeks of employment.

A. After Manager's first six weeks of employment or first paid public performance, whichever is later, Managers shall be entitled to "borrow" up to six performances of sick leave. This entitlement expires after Manager accrues six performances of sick leave or if there are four weeks or less remaining on Manager's contract.

B. Sick leave shall be credited at the beginning of each four week period.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 4

## 9.    BONDS

The Employer shall place with the union sufficient bond to cover two weeks of gross salaries, inclusive of annuity, plus vacation pay, pension and welfare for all ATPAM employees, plus an additional $750.00 bond for Press Agent's expenses if a Press Agent is engaged. In the event the Union is required to pay to an employee any such salaries and/or authorized expenses or to collect welfare, annuity or pension payments out of said surety or bond, the Union shall be entitled to charge the affected Employer a fee of $100.00 as an expense of administration.  The Union shall only charge the $100.00 administration fee as a last resort in trying to collect said monies from the Employer.

Employees shall not be required to perform services until proper bond has been placed with the union.  All bonds shall be returned to the producer by the union promptly upon settlement of all outstanding payments due the union or its members, but in no event later than thirty days following the closing of the attraction.

If the employer posts a cash bond, ATPAM shall deposit said bond in an interest bearing account.  All interest income shall be divided equally between the League and ATPAM.

Press Agents will make his/her best efforts to submit the most current expense bills available, with documentation, on a monthly basis or sooner.   Producer agrees to reimburse said expense bills in a timely fashion, provided such expenses are not in dispute.

## 10.    ARBITRATION AND GRIEVANCE

When the parties disagree on any issues relating to the interpretation or application of the Minimum Basic Agreement between ATPAM and the League of Off-Broadway Theatres and Producers, Inc., the matter may be submitted to a Grievance Committee at the request of either ATPAM, the League, or an individual producer, and if not decided by the Grievance Committee, it shall be submitted to binding arbitration by the American Arbitration Association.  Each party shall share equally in the cost of such arbitration by AAA.  Grievance Committee procedures shall follow the format established by the current agreement between Actors' Equity Association and the League of Off-Broadway Theatres and Producers.

## 11.    EMPLOYMENT

In theatres of 100-199 seats, either a Manager or a Press Agent must be employed.  In the event that a commercial producer in theatres of 100-199 seats, engages an employee who performs duties of a Manager and an employee who performs duties of a Press Agent, said individuals shall be governed by this agreement, except that the Press Agents salary shall be sixty-five percent (65%) of the minimum required for the production, for all productions opening after July 1, 2001.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 5

In theatres of 200-499 seats, both a Manger and a Press Agent must be employed.

**A.**    **Start of Employment**

Managers and Press Agents on musicals or dramatic attractions shall be employed commencing with the Monday of the week in which rehearsals commence, but in no event less than four (4) weeks prior to the Monday of the week in which the first performance occurs. Anything contained above to the contrary notwithstanding, any attraction which has less than four (4) week rehearsal schedule shall have the right to appeal to the union for a reduction of this requirement.

In the event of a transfer of a production from either a Lort Theatre or from one Off Broadway Theatre to another (including under 99 seat houses), where there is less than two weeks of rehearsal, the Managers and Press Agents shall begin their contractual term two weeks prior to the first performance, provided that the original employees are retained.

In the event that a production is rehearsed in New York City and performs out-of-town under a contract other than Off-Broadway, immediately prior to its Off-Broadway engagement, the salaries of the Managers and Press Agents for the Off-Broadway production shall be those applicable to a Category D (irrespective of the rate applicable to the Off-Broadway Theatre in which the production is actually presented) for the period of the rehearsal and again upon its return to Off-Broadway. In addition, in the event that the production is presented in a Category D Theatre, then the Managers and Press Agents shall be paid a supplement of $150.00 a week for the duration of the Off-Broadway production (including rehearsals); provided, however, in no event shall the foregoing supplement be payable to any Managers or Press Agents on the Production who, for any reason, replaces the original Managers or Press Agents employed on the Production after the time of its Off-Broadway first public performance. (During the second through fifth years of this Agreement the $150.00 supplement shall be subject to the annual increases set forth in the wage provisions in Section 4 of this Agreement).

A Press Agent must be engaged for the entire presentation through the final performance of any attraction, except as provided in Section 11B.

A Manager must be engaged for the entire presentation and one (1) week following the final performance of any attraction.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 6

**B.     Termination of Employment by Closing Attraction**

A minimum of one week's written notice of termination shall be given in the event of the closing of the attraction.

If an attraction has run more than twenty-six (26) weeks, beginning with the first full week of productions of five (5) or more performances, the employer may, upon giving notice to the theater and one (1) weeks written notice to the Press Agent and notification to the Union, may terminate a Press Agent three (3) weeks prior to the closing of the attraction.  After termination has been served, the Press Agent shall not be required to do any additional work during the three (3) weeks prior to the closing of the attraction nor shall the Press Agent be required to do any work after the attraction has closed without proper compensation in both instances.

**C.     Termination of Employment by Individual Notice**

Individual notice of termination of any Manager or Press Agent shall require written notification to the ATPAM member by the producer, or to the producer by the ATPAM member, with a copy in each case to the union, and such written notice shall be given not less than two (2) weeks prior to the date of termination.

If termination of employment is the result of individual notice given by the producer to an ATPAM member, the following notice of severance pay shall be due to the dismissed employee, unless such dismissal shall be for "Just Cause".

Employment for up to 12 weeks:      2 weeks notice or severance pay
Employment for 13-24 weeks:         4 weeks notice or severance pay
Employment for 25 weeks or more:    6 weeks notice or severance pay

**12.    STANDARD INDIVIDUAL CONTRACTS OF EMPLOYMEMT**

All employees who are Managers or Press Agents shall be required to file a Standard Individual Contract of Employment with the union, and all conditions of employment, including total salaries, commencement date of employment, run of play stipulations if applicable, shall be included, signed first by management and then by the employee, and filled promptly with the union office.  No employee shall be required to perform services without having a signed Standard Individual Contract of Employment filed with the union, a copy of which is hereby annexed.  All references to "MINIMUM BASIC AGREEMENT" contained in said annexed contract shall refer only to the terms and conditions of this Minimum Basic agreement between the Association of Theatrical Press Agents and Managers and the League of Off-Broadway Theatres and Producer.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 7

13.    **ADDITIONAL COMPENSATION**

A.    **Recording, Filming, Taping**

When a Manager is required to perform work in connection with the taping, filming or recording of an attraction. He or she shall be paid an amount equal to one (1) week's contractual salary. However, any taping, filming, or recording exempted by Actors' Equity Association's Agreement Governing Off-Broadway, wherein no payments are made to Equity members, shall also be exempted from payments to ATPAM members (i.e. news broadcast, reviews, etc.) No payments shall be made to ATPAM members in the event of the taping, filming or recording of radio or television commercials either in or out of the theater.

B.    **Souvenir Books**

The Press Agent shall be paid one (1) week's salary whenever a souvenir journal of a show is produced.

C.    **Cast Albums**

The Press Agent shall receive one (1) week's contractual salary for each production album recorded, subject to the following conditions:

If any or all of the individual tasks listed within either Group A or Group B, as defined below, are performed, the Press Agent shall receive one half (1/2) week's salary. If any or all duties in Group A are combined with any or all of the duties in Group B, the Press Agent shall be entitled to a full week's salary. It is agreed that providing existing company photos or material to the producer or to the record company shall not trigger any payment.

Group A
-Compilation and/or editing of liner notes
-Photo research/compilation of CD jacket design
-Print/broadcast coverage of recording session

Group B
-Participation in any publicity event promoting the recording or the sale of cast recording (record store appearance, print/broadcast interviews geared to release of recording)
-Release of journalistic contacts/mailing lists (intellectual property) to recording label
-Distribution of cast album to entertainment journalists on behalf of the recording label.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 8

**D.    Recording after closing**

For up to one year from the closing of the Play, the Producer shall be subject to the Cast Album requirements outlined in Section 13A and 13C as it pertains to the Managers and Press Agents under this agreement.

**E.    Seventh Consecutive Day**

If a Manager works on a seventh consecutive day, he or she shall receive an additional $2/6^{th}$ of the weekly salary for each such seventh consecutive day worked, as additional compensation, subject to the prior written approval of the Producer.  However, in the event of a change in the performance schedule from a Tuesday through Sunday to a Monday through Saturday schedule, the seventh day premium shall be waived, provided no less than two (2) weeks written notice of such change is given, and provided that there is one day off in each calendar week.

This rule shall not apply to the seven days preceding the first paid public performance of a production.

**F.    Reimburse for Equipment**

1.  If required by Producer, Producer shall supply the Managers with a working computer and printer.

2.  Per the Producer's written approval, the Manager may be allowed to use his/her own computer and printer.  In that event the Producer shall reimburse the Manager for said use, at a rate of $25.00 per week.  In the event that the Producer no longer requires the Manager to use a computer said rental may be discontinued.

3.  The producer's normal theatrical insurance floater shall cover the Manager's computer and printer.

**G.    Meals**

If the performing company and/or the crew receives meal money, so shall the managers.

**14.    NEW AGREEMENTS**

This agreement embodies the full understanding between the parties hereto, and no conditions shall apply except what is specifically contained herein.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 9

Within sixty (60) days prior to the expiration date of this agreement either party may request the opening of negotiations for a new agreement.

### 15.    DUES CHECK OFF

The Employer agrees to deduct from each employee's salary and remit to ATPAM union working dues, as designated by the union.  As of July 1, 2001 the current working dues are three and a quarter percent (3 ¼%) of the gross weekly salary.

The Employer agrees that a written assignment in the following terms will be acceptable:
    "Effective immediately, the undersigned assigns to the Association of Theatrical Press Agents and Managers, I.A.T.S.E., Local 18032, an amount equal to the monthly membership dues to be deducted from wages earned and to be earned as an employee, and authorizes and directs the employer to deduct such amount from wages and to remit the same to said Union.  This assignment shall be irrevocable for a period consisting of either one year or until termination of the applicable collective bargaining agreement, whichever is sooner, and shall be automatically renewed, with the same irrevocability, for successive like periods unless terminated by the undersigned in writing not more than twenty nor less than ten days prior to the expiration of such period."

### 16.    UNION SECURITY

The Union shall have the right to require, as a condition of employment, that any employees covered by this agreement be and remain a member in good standing.  On or after the 31st day after the first day of employment in the case of those employees who are not members of the union at the time of employment, such employees shall, if requested to do so by the union, become and remain members of the union in good standing.

MINIMUM BASIC AGREEMENT
Off-Broadway, July 1, 2001 – June 30, 2006
Page 10

## 17.    INDEMNIFICATION BY EMPLOYER OF CLASSIFICATIONS COVERED BY THIS AGREEMENT

The Employer, its successors and assigns, holds each employee covered by this Agreement harmless from and indemnified against any and all awards, judgements, damages and costs (including reasonable attorneys fees) that may be incurred as a result of any claims, demands, suits or proceedings made or brought against the employee for any act or conduct of the employee within the scope of his or her employment during the course of his or her employment by the employer, provided that such act or conduct was neither reckless nor undertaken by the employee with intent to commit fraud or to willfully violate the law or this Agreement.

AGREED:

For the Association of
Theatre Press Agent and
Managers

For the League of Off-Broadway
Theatres and Producers, Inc.

_____
Gordon G. Forbes
Secretary-Treasurer

_____
Ben Sprecher
2nd Vice President

_____
Terry Byrne
Secretary-Treasurer

Dated: 8/16/01

## APPENDIX A: RATES - PRESS AGENTS - JULY 1, 2001 - JUNE 30, 2002
WAGE INCREASE - CPI 3.25% (LESS 2% ANNUITY)

| CATEGORY A | 100 - 199 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 738.95 | 62.81 | 801.76 | 16.04 |
| 50,000 - 60,000 | 744.01 | 63.24 | 807.25 | 16.15 |
| 60,001 - 70,000 | 748.06 | 63.59 | 811.65 | 16.23 |
| 70,001 - 80,000 | 753.12 | 64.02 | 817.14 | 16.34 |
| 80,001 - 89,500 | 756.16 | 64.27 | 820.43 | 16.41 |
| 89, 501 - 101,500 | 761.22 | 64.70 | 825.92 | 16.52 |
| over 101,501 | 765.27 | 65.05 | 830.32 | 16.61 |

SIXTY-FIVE PERCENT - 65%

| CATEGORY A | 100 - 199 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 480.32 | 40.83 | 521.15 | 10.42 |
| 50,000 - 60,000 | 483.61 | 41.11 | 524.72 | 10.49 |
| 60,001 - 70,000 | 486.24 | 41.33 | 527.57 | 10.55 |
| 70,001 - 80,000 | 489.53 | 41.61 | 531.14 | 10.62 |
| 80,001 - 89,500 | 491.50 | 41.78 | 533.28 | 10.67 |
| 89, 501 - 101,500 | 494.79 | 42.06 | 536.85 | 10.74 |
| over 101,501 | 497.43 | 42.28 | 539.71 | 10.79 |

| CATEGORY B | 200 - 299 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 761.22 | 64.70 | 825.92 | 16.52 |
| 50,001 - 60,000 | 765.27 | 65.05 | 830.31 | 16.61 |
| 60,001 - 70,000 | 770.33 | 65.48 | 835.80 | 16.72 |
| 70,001 - 80,000 | 775.40 | 65.91 | 841.30 | 16.83 |
| 80,001 - 89,500 | 780.45 | 66.34 | 846.78 | 16.94 |
| 89, 501 - 101,500 | 784.50 | 66.68 | 851.19 | 17.02 |
| over 101,501 | 789.55 | 67.11 | 856.67 | 17.13 |

| CATEGORY C | 300 - 399 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 872.57 | 74.17 | 946.74 | 18.93 |
| 50,001 - 60,000 | 872.57 | 74.17 | 946.74 | 18.93 |
| 60,001 - 70,000 | 879.65 | 74.77 | 954.42 | 19.09 |
| 70,001 - 80,000 | 886.74 | 75.37 | 962.11 | 19.24 |
| 80,001 - 89,500 | 892.82 | 75.89 | 968.71 | 19.37 |
| 89, 501 - 101,500 | 898.88 | 76.40 | 975.28 | 19.51 |
| over 101,501 | 903.94 | 76.83 | 980.77 | 19.62 |

| CATEGORY D | 400 - 499 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 1,001.12 | 85.10 | 1086.22 | 21.72 |
| 50,001 - 60,000 | 1,001.12 | 85.10 | 1086.22 | 21.72 |
| 60,001 - 70,000 | 1,001.12 | 85.10 | 1086.22 | 21.72 |
| 70,001 - 80,000 | 1,010.24 | 85.87 | 1096.11 | 21.92 |
| 80,001 - 89,500 | 1,020.35 | 86.73 | 1107.08 | 22.14 |
| 89, 501 - 101,500 | 1,031.49 | 87.68 | 1119.17 | 22.38 |
| over 101,501 | 1,036.55 | 88.11 | 1124.66 | 22.49 |

## APPENDIX B: RATES - MANAGERS - JULY 1, 2001 - JUNE 30, 2002
WAGE INCREASE - 5% (LESS 2 % ANNUITY)

| CATEGORY A | 100 - 199 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 751.47 | 63.87 | 815.34 | 16.31 |
| 50,001 - 60,000 | 756.62 | 64.31 | 820.93 | 16.42 |
| 60,001 - 70,000 | 760.74 | 64.66 | 825.40 | 16.51 |
| 70,001 - 80,000 | 765.88 | 65.10 | 830.98 | 16.62 |
| 80,001 - 89,500 | 768.97 | 65.36 | 834.33 | 16.69 |
| 89, 501 - 101,500 | 774.12 | 65.80 | 839.92 | 16.80 |
| over 101,501 | 778.23 | 66.15 | 844.38 | 16.89 |

| CATEGORY B | 200 - 299 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 774.12 | 65.80 | 839.92 | 16.80 |
| 50,001 - 60,000 | 778.23 | 66.15 | 844.38 | 16.89 |
| 60,001 - 70,000 | 783.38 | 66.59 | 849.97 | 17.00 |
| 70,001 - 80,000 | 788.53 | 67.03 | 855.56 | 17.11 |
| 80,001 - 89,500 | 793.67 | 67.46 | 861.13 | 17.22 |
| 89, 501 - 101,500 | 797.80 | 67.81 | 865.61 | 17.31 |
| over 101,501 | 802.95 | 68.25 | 871.20 | 17.42 |

| CATEGORY C | 300 - 399 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 887.35 | 75.42 | 962.77 | 19.26 |
| 50,001 - 60,000 | 887.35 | 75.42 | 962.77 | 19.26 |
| 60,001 - 70,000 | 894.56 | 76.04 | 970.60 | 19.41 |
| 70,001 - 80,000 | 901.76 | 76.65 | 978.41 | 19.57 |
| 80,001 - 89,500 | 907.94 | 77.18 | 985.12 | 19.70 |
| 89, 501 - 101,500 | 914.11 | 77.70 | 991.81 | 19.84 |
| over 101,501 | 919.26 | 78.14 | 997.40 | 19.95 |

| CATEGORY D | 400 - 499 | plus vacation | total | annuity |
|---|---|---|---|---|
| 0-$50,000 | 1,018.09 | 86.54 | 1104.63 | 22.09 |
| 50,001 - 60,000 | 1,018.09 | 86.54 | 1104.63 | 22.09 |
| 60,001 - 70,000 | 1,018.09 | 86.54 | 1104.63 | 22.09 |
| 70,001 - 80,000 | 1,027.35 | 87.32 | 1114.67 | 22.29 |
| 80,001 - 89,500 | 1,037.64 | 88.20 | 1125.84 | 22.52 |
| 89, 501 - 101,500 | 1,048.97 | 89.16 | 1138.13 | 22.76 |
| over 101,501 | 1,054.12 | 89.60 | 1143.72 | 22.87 |

*Exhibit 3*

# AGREEMENT
# AND
# DECLARATION
# OF TRUST



## ESTABLISHING THE
## I.A.T.S.E. ANNUITY FUND

THIS AGREEMENT AND DECLARATION OF TRUST, amended and restated as of the 1st day of February 1995 (including all amendments through February 1, 2005), establishing the I.A.T.S.E. ANNUITY FUND, by and among (a) DANIEL DITOLLA, PETER FITZPATRICK, BRIAN LAWLOR, MATTHEW D. LOEB, JOHN MCNAMEE, DEBORAH REID, THOMAS C. SHORT, and JAMES B. WOOD on behalf of the INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, MOVING PICTURE TECHNICIANS, ARTISTS AND ALLIED CRAFTS OF THE UNITED STATES AND CANADA and as Union Trustees; and (b) IRVING W. CHESKIN, DEAN FERRIS, CAROL LOMBARDINI, SETH POPPER, STEVE RAPAPORT, JEFFREY RUTHIZER, HARRIET SLAUGHTER, and HOWARD WELINSKY on behalf of the Employers contributing to the Plan and as Employer Trustees.

group, collective or commingled real estate funds, and investments in securities issued by real estate investment trusts). For purposes of this definition, real property includes any property treated as real property either by local law or state law or for Federal income tax purposes.

I.21  "Securities" or "Security" shall mean, except as may otherwise be provided in a written agreement or investment guidelines between the Board and an Investment Manager, all Trust Fund securities of any and every kind wherever situated, and any rights or interests therein, including, but not limited to: (a) common and preferred stocks, including the stock of an Employer (or any parent, subsidiary or other person associated or affiliated therewith) to the extent permitted by ERISA; (b) obligations of the United States Government or any government of a state of the United States (and any of their agencies and instrumentalities); (c) bonds, debentures, notes and other evidences of indebtedness, including bonds, debentures or notes of an Employer (or any parent, or other person associated or affiliated therewith) to the extent permitted by ERISA; (d) savings and time deposits (including, without limitation, any deposits bearing a reasonable rate of interest that the Custodian, or a bank or similar financial institution appointed as a trustee or custodian hereunder by the Board, makes in itself or in any parent, subsidiary or other person associated or affiliated therewith, to the extent permitted by law); (e) bankers' acceptances; (f) commercial paper (including participations in pooled commercial paper accounts); (g) Collective Trusts; (h) Foreign Securities (including, without limitation, American Depository Receipts; (i) participation units or certificates issued by investment companies or investment trusts; (j) collateral trust notes; (k) equipment trust certificates; (l) life insurance, retirement income, guaranteed investment, annuity and other forms of insurance policies or contracts; (m) bank investment contracts; (n) leaseholds, leasebacks, fee titles, mortgages and any other interests in real property; and (o) any options, warrants or other instruments representing rights to receive, purchase, or subscribe for the same or evidencing or representing any other rights or interest therein appurtenant to such Securities.

I.22  "Trust," "Trust Fund," or "Fund" shall mean the I.A.T.S.E. Annuity Fund, including all cash, Securities and other property which at the time of reference shall have been deposited in the trust account established pursuant to this Agreement or held by a Custodian, including any portion thereof which has been segregated in an Investment Manager Account or held under a group trust or Collective Trust, and any Real Property or Interest in Real Property at any time held by the Trust Fund.

I.23  "Trustee(s)" shall mean collectively the individual Employer Trustees, the individual Union Trustees and, when acting as Trustees, their successors and assigns.

I.24  "Union" shall mean the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States and Canada and any affiliated local union thereof.

I.25  "Union Trustees" shall mean DANIEL DITOLLA, PETER FITZPATRICK, BRIAN LAWLOR, MATTHEW D. LOEB, JOHN MCNAMEE, DEBORAH REID, THOMAS C. SHORT, and JAMES B. WOOD and, when acting as Union Trustees, their successors appointed pursuant to the procedures set forth in Article III.

# ARTICLE II

## NAME, PURPOSE AND OPERATION OF TRUST

II.1  Name.  The Trust shall be known as the "I.A.T.S.E. Annuity Fund."

II.2  Purpose.  The Trust is established for the exclusive purpose of providing certain retirement and related benefits to Covered Employees and their Beneficiaries under the Plan, and shall further

provide the means for financing and maintaining the operation and administration of the Trust and the Plan in accordance with this Agreement, the Plan, and applicable law.

II.3  Establishment of Fund.  As hereby created, the assets of the Fund shall be comprised of and derived from Employer Contributions made to or for the account of this Fund under Collective Bargaining Agreements, together with any and all investments made by or on behalf of the Trustees, or monies received by the Trustees as contributions or as income from investments made and held by the Trustees or otherwise, and any other money or property, received and/or held by the Trustees for the uses purposes and Trust set forth in this Agreement.

II.4  Operation.

(a) It is intended that this Trust shall be established and operated in a manner that shall qualify it as an organization exempt from income taxation under Section 501(a) of the Code, so as to ensure that the earnings of the Trust Fund remain exempt from income tax under the Code, and that Employer Contributions remain tax deductible under the Code.  Notwithstanding anything to the contrary contained herein, the Trust shall be operated exclusively for such purposes as will comply with Section 501(a) of the Code.  To the extent that anything herein is inconsistent with the Code, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of the Code.

(b) It is further intended that this Trust shall be established and operated in a manner that complies with ERISA.  To the extent that anything herein is inconsistent with ERISA, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of ERISA.

(c) The Trust shall also be established and operated as a "jointly-administered" employee benefit pension plan within the meaning of, and in accordance with, Section 302(c) of the Labor Management Relations Act of 1947, as amended, and Section 3(2)(A) of ERISA.  To the extent that anything herein is inconsistent with said Act, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of said Act.

II.5  Participation by Contributing Employers.  Any Employer may participate in the Trust and the Plan by:

(a) Executing a Collective Bargaining Agreement or otherwise adopting such agreement by its course of conduct;

(b) Designating a date on which such participation shall become effective;

(c) Designating the categories of employment and its Covered Employees for participation in the Plan; and

(d) Acceptance by the Board of the participation by such Employer in the Plan and Trust; provided, however, that the Board may, in its discretion, terminate participation by an Employer at any time by written notice to the Employer.

II.6  Obligations of Contributing Employers.  By executing or complying with the terms of a Collective Bargaining Agreement, each Employer shall be deemed (without any further action) to have, inter alia:

the performance of his or her powers, duties, responsibilities or obligations under the Plan, the Trust, this Agreement, ERISA, the Code or other applicable laws, except with respect to Claims arising from such person's own fraud or willful misconduct or except as may be prohibited under ERISA.

(g) The Trustees may, in their sole discretion, seek judicial protection, by any action or proceeding they may deem necessary, to settle their accounts or to obtain judicial determination or declaratory judgment as to any question of construction of this Agreement or instruction as to any action thereunder. The Trustees shall be required to join as party defendants in any such action or proceeding only the Union and the Employers who have contributed in the preceding six months, although the Trustees may also join such other parties therein as they may deem necessary or appropriate. In no event shall such power in any manner limit or otherwise affect or circumscribe the rights of the Union or the Employers under their Collective Bargaining Agreements or the laws of the State of New York and/or the United States.

V.10  Bonding. Any person required to be bonded under the provisions of ERISA, including without limitation the Trustees, Administrator, Investment Managers, Custodians (and any employees, agents or other representatives of the Trust handling monies, Securities and negotiable paper on behalf of the Trust or otherwise entrusted with any portion of the Trust Fund), shall be bonded under a fidelity bond issued by an insurance carrier or duly authorized surety company qualified under the laws of the State of New York in the amount required by Section 412 of ERISA. The Board shall, in its sole discretion, have the authority to require the bonding of any other employee of the Trust and to require bonds above the minimum amount. The cost of premiums for such bonds shall be paid out of the Trust Fund.

V.11  Fiduciary Insurance. The Board may purchase with Fund assets and maintain a policy or policies of fiduciary liability (or errors or omissions) insurance covering the Trust Fund, the Trustees, the Administrator and, if the Board so determines, any other person to whom a fiduciary responsibility with respect to the Plan or Fund has been allocated or delegated, to protect such persons against any and all Claims (as that term is defined in Section 5.10(f) of this Agreement) arising out of such fiduciary's breach of his or her fiduciary responsibility to the Plan or the Trust Fund (the proceeds of which may be used to satisfy the obligations of the Trust Fund, the Employers and the Union set forth in Section 5.10 of this Article V). The insurance contemplated herein shall permit recourse by the insurer against the fiduciary in case of a breach of his or her fiduciary obligations or responsibilities to the Trust Fund (although the insurer shall have the right to eliminate such recourse by the payment of an additional premium by such fiduciary or by the organization that appointed such fiduciary to the Board).

V.12  Deposit and Withdrawal of Funds.

(a) All monies received by the Board hereunder shall be deposited with the Custodian, or such other banks or trust companies (insured by the Federal Deposit Insurance Corporation) or other broker-dealers or similar financial institutions (insured by the Securities Investor Protection Corporation) as the Board may designate as Custodians or other trustees of all or a portion of the assets of the Trust.

(b) The requisite signature authority required for all checks, drafts, vouchers or other withdrawals of monies from such account or accounts shall be in accordance with policies or resolutions from time to time adopted by the Board, and the Board may delegate such authority to any two Trustees (one of whom must be an Employer Trustee and the other a Union Trustee), to the Administrator, to an employee of the Fund, or to any other person as the Board, in its sole discretion, shall determine pursuant to such policies or resolutions.

V.13  Delegation of Power. Except as otherwise provided by ERISA, the Board may delegate any of its ministerial powers or duties hereunder to a Committee or any one or more agents or employees and/or to one or more Trustees.

*Exhibit 4*

AGREEMENT AND DECLARATION OF TRUST

ESTABLISHING THE

LEAGUE-ATPAM PENSION TRUST FUND

Amended and restated September 22, 1993

Effective as of September 1, 1993

## ARTICLE 2

### NAME, PURPOSE AND OPERATION OF TRUST

2.1  <u>Name</u>.  The Trust shall be known as the "League-ATPAM Pension Fund."

2.2  <u>Purpose</u>.  The Trust is established for the exclusive purpose of providing certain pension and related benefits to Covered Employees under the Plan, and shall further provide the means for financing and maintaining the operation and administration of the Trust and Plan in accordance with this Agreement, the Plan, and applicable law.

2.3  <u>Operation</u>.  It is intended that this Trust shall be established and operated in a manner that shall qualify it as an organization exempt from income taxation in accordance with Section 501(a) of the Code.  Notwithstanding anything to the contrary contained herein, the Trust shall be operated exclusively for such purposes as will comply with Sections 401(a) and 501(a) of the Code, and to the extent that anything herein is inconsistent therewith, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of the Code.

It is further intended that this Trust shall be established and operated in a manner that complies with ERISA.  To the extent that anything herein is inconsistent with ERISA, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of ERISA.

The Trust shall also be established and operated as a "jointly-administered" pension fund within the meaning of, and in accordance with, Section 302(c) of the Labor Management Relations Act of 1947, as amended.

2.4  <u>Participation by Contributing Employers</u>.  Any Contributing Employer acceptable to the Trustees may participate in the Trust and the Plan by:

       (a)  executing a copy of a Collective Bargaining Agreement, or standard individual contract of employment incorporating a Collective Bargaining Agreement, approved by the Board requiring contributions to be made by such Employer to the Fund;

       (b)  designating a date on which such participation shall become effective; and

8

(j)  (1) Compromise, compound, submit to arbitration or settle any debt or obligation owing to or from the Trust Fund; (2) enforce or abstain from enforcing any right, claim, debt or obligation; (3) reduce or increase the rate of interest on extension, or otherwise modify, foreclose upon default, or enforce any such obligation; and (4) sue or defend suits or legal proceedings to protect or enforce any interest in the Trust Fund and to represent the Trust Fund in suits or legal proceedings in connection with any matter in any court or before any administrative agency, body or tribunal, provided such action is consistent with ERISA;

(k)  Apply for, purchase, receive, retain, administer, surrender, transfer or assign any insurance policy or contract, and pay the premium and exercise the rights, privileges, options and benefits contained in any such contract;

(l)  Organize corporations, partnerships, and/or joint-ventures under the laws of any jurisdiction to acquire and hold title to any Securities or other property held in connection with the Trust Fund;

(m)  Take any and all actions, including the filing of requests for determinations, rulings and other forms of administrative guidance with the United States Department of Labor (including requests for exemptive or other administrative relief from the provisions of Section 406 of ERISA and Section 4975 of the Code, or other provisions of ERISA or the Code), the Internal Revenue Service, or the Pension Benefit Guaranty Corporation, and the commencement of and participation in lawsuits; all as the Board determines to be necessary, appropriate or desirable to carry out any of the foregoing powers or otherwise in the best interests of the Plan or the Trust Fund;

(n)  (1) Lease or purchase such premises, materials, supplies and equipment, and employ and retain such administrative, secretarial, clerical, and other assistance or employees as the Board may deem necessary or proper, and to pay their reasonable expenses

21

# *Exhibit 5*

AGREEMENT AND DECLARATION OF TRUST

ESTABLISHING THE

LEAGUE-ATPAM WELFARE TRUST FUND

Adopted and restated September 22, 1993

Effective as of September 1, 1993

## ARTICLE 2

## NAME, PURPOSE AND OPERATION OF TRUST

2.1  Name.  The Trust shall be known as the "League-ATPAM Welfare Fund."

2.2  Purpose.  The Trust is established for the exclusive purpose of providing certain health, welfare and/or related benefits to Covered Employees under the Plan, and shall further provide the means for financing and maintaining the operation and administration of the Trust and Plan in accordance with this Agreement, the Plan, and applicable law.

2.3  Operation.  It is intended that this Trust shall be established and operated in a manner that shall qualify it as an organization exempt from income taxation in accordance with Section 501(a) of the Code.  Notwithstanding anything to the contrary contained herein, the Trust shall be operated exclusively for such purposes as will comply with Section 501(c)(9) of the Code, and to the extent that anything herein is inconsistent therewith, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of the Code.

It is further intended that this Trust shall be established and operated in a manner that complies with ERISA.  To the extent that anything herein is inconsistent with ERISA, this Agreement shall be deemed amended in such fashion as will implement the purposes of this Trust while continuing to comply with the requirements of ERISA.

2.4  Participation by Contributing Employers.  Any Contributing Employer acceptable to the Trustees may participate in the Trust and the Plan by:

    (a)  executing a copy of a Collective Bargaining Agreement, or standard individual contract of employment incorporating a Collective Bargaining Agreement, approved by the Board requiring contributions to be made by such Employer to the Fund;

    (b)  designating a date on which such participation shall become effective; and

    (c)  designating the categories of employment of Covered Employees to participate in such Plan.

2.5  Obligations of Contributing Employers.  By executing a Collective Bargaining Agreement, or standard individual

8

deposits of a Custodian, to the extent permitted by ERISA);

(j) (1) Compromise, compound, submit to arbitration or settle any debt or obligation owing to or from the Trust Fund; (2) enforce or abstain from enforcing any right, claim, debt or obligation; (3) reduce or increase the rate of interest on extension, or otherwise modify, foreclose upon default, or enforce any such obligation; and (4) sue or defend suits or legal proceedings to protect or enforce any interest in the Trust Fund and to represent the Trust Fund in suits or legal proceedings in connection with any matter in any court or before any administrative agency, body or tribunal, provided such action is consistent with ERISA;

(k) Apply for, purchase, receive, retain, administer, surrender, transfer or assign any insurance policy or contract, and pay the premium and exercise the rights, privileges, options and benefits contained in any such contract;

(l) Organize corporations, partnerships, and/or joint-ventures under the laws of any jurisdiction to acquire and hold title to any Securities or other property held in connection with the Trust Fund;

(m) Take any and all actions, including the filing of requests for determinations, rulings and other forms of administrative guidance with the United States Department of Labor (including requests for exemptive or other administrative relief from the provisions of Section 406 of ERISA and Section 4975 of the Code, or other provisions of ERISA or the Code), the Internal Revenue Service, and the commencement of and participation in lawsuits; all as the Board determines to be necessary, appropriate or desirable to carry out any of the foregoing powers or otherwise in the best interests of the Plan or the Trust Fund;

(n) (1) Lease or purchase such premises, materials, supplies and equipment, and employ and retain such administrative, secretarial, clerical, and other assistance or employees as the Board may deem necessary

21

*Exhibit 6*

# IATSE NATIONAL BENEFIT FUNDS

**Pension Fund**
**Health & Welfare Fund**
**Annuity Fund**
**Vacation Fund**
**401(k) Fund**

## CONTRIBUTIONS & COLLECTIONS HANDBOOK



55 West 39th Street - 5th Floor
New  York, NY 10018-3803
800-456-FUND
Tel # (212) 580-9092
Fax# (212) 787-3607

In view of these circumstances, and pursuant to the provisions of the Trust Agreement, the Trustees adopt the following rules applicable to contributions made as a result of a good faith mistake of fact or law:

1. No refund of mistakenly made contributions shall be made except to the extent that such refund complies with the requirements of Section 403(c)(2)(A)(ii) of ERISA.

2. The Trustees, or their duly authorized representative, shall have sole and exclusive authority to determine whether a contribution has been made by a good faith mistake or fact or law and shall have full discretion in applying the Funds' rules regarding the return of mistaken contributions. If the Trustees discover or otherwise determine that an employer has submitted false, fraudulent, or unreliable evidence in support of its claim, they may, in their sole and absolute discretion, determine whether, and in what amount if any, a refund shall be issued.

3. Absent extraordinary circumstances and Trustee approval, no refund shall be made of contributions that have been distributed, spent, or which have been relied upon in determining the basis of coverage or eligibility, In no event, absent extraordinary circumstances, shall contributions be returned if the employer request their return more than three months after the plan year in which such contributions were received or for which such contributions were attributable, not-withstanding the fact that the Trustees determined the contributions to be made by mistake of fact or law.

4. No refund of mistaken contributions shall be made if, in the discretion of the Trustees, after analysis of each affected Fund's financial condition, investments, and funding methods, a refund of contributions would prejudice the financial position of any Fund or jeopardize its actuarial soundness.

5. Any interest or investment income earned on mistaken contributions shall not be returned to an employer. Any investment losses may be deducted before a refund of mistaken contributions.

6. Contributions may only be returned, in accordance with these guidelines, within six (6) months of the Trustees' determination that the contributions were made as a result of a good faith mistake of fact or law.

7. Trustees may deduct from any refund reasonable expenses incurred by the Fund(s) as a result of the overpayment and request for return (including, but not limited to, attorneys' fees and cost, accounting, auditing, actuarial and other professional fees or costs, or other administrative expenses).